[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 529 
This appeal involves a violation of § 16-18, General Code of Birmingham. Appellant was fined $350.00 and sentenced to 180 days hard labor.
The City of Birmingham charged in a Complaint that Jimmy Coble, the appellant, knowingly and unlawfully "sold an obscene book or magazine or matter entitled . . . `Special No. 20' to D.S. Luker which depicted or portrayed the following sexual conduct: Actual act or acts of homosexuality between males, homosexuality between females, sexual intercourse, fellatio, contrary to and in violation of Section 16-18 of the General Code of the City of Birmingham, Alabama, 1964, as amended." The appellant was tried in the Municipal Court without a jury, and was convicted. He appealed to the Jefferson Circuit Court.
The appellant filed, in the circuit court, a motion to suppress evidence and a motion to quash, both of which were overruled after supporting evidence was presented at a hearing prior to trial. The appellant was tried by a jury in the Jefferson Circuit Court and was found guilty as charged in the Complaint.
At the hearing on the motions, Richard Townes, Commander of the Administrative Vice Division for the City of Birmingham, acknowledged that he had discussed with Sgt. Triplett, Lt. Webb, and Officer Luker the type of bookstores in which arrests for obscenity violations would be made. Townes denied that they had decided not to make arrests of distributors of publications such as "Hustler," "Oui," "Playboy," and "Penthouse." Townes stated, "We just decided that we would enforce the City Ordinance that was pertaining to pornography." The record reveals the following:
 "THE COURT: Captain, tell me what policy if any, y'all have about enforcing those laws with reference to the various places.
 "THE WITNESS: The policy is to enforce it against everybody that violates the obscenity laws of the City, taking into consideration the fact that these things have to be taken as a whole, the entire magazine. As much as I may dislike a number of other magazines, I just don't feel that it's within the policy of the Birmingham Police Department to move at this time against them.
 "THE COURT: Are you in effect telling me that these officers when they make an arrest go get the worst they can find?
"THE WITNESS: Yes, sir.
 "Q. And that's the only arrest that you make, just against the worst that you can find?
"A. Yes, sir.
 "Q. You are aware, of course, that for — Well, I withdraw that question.
 "You are saying then, Captain, that it is the policy of your detail, the Vice detail, not to make arrests of publications that are sold monthly, national publications that are sold monthly no matter what may be contained within their covers?
"A. No, sir, I didn't say that.
"Q. What do you say, sir?
 "A. I'm saying that we — of course, I don't — at my direction Lt. Webb and to the members in the Pornography Section are to arrest those persons who violate the City Ordinance, taking into consideration the complete text and alignment of the material contained in the total piece of the merchandise — or the worst."
James Melvin Burns, Magistrate of the City of Birmingham testified, that on June 5, 1978, he was familiar with the guidelines in the City Code for issuing arrest warrants. After viewing "Special Number 20," the witness recognized two photographs in the magazine. Burns, when asked whether he knew in June, 1978, the criteria necessary to constitute obscenity, answered, "I *Page 530 
don't remember what my thought processes were."
Regarding the determination of probable cause, the record reveals the following:
 "Q. Do you recall whether or not you took into consideration contemporary community standards in making your determination of probable cause that Special Number 20 was obscene?
. . . . .
 "A. All I can say is I do not have any specific recollection of what I thought at the time.
 "THE COURT: Did you know these guidelines, these criteria back on June — whatever this thing is dated?
 "THE WITNESS: It was in the City Code. That's what I used, yes.
"THE COURT: Did you look at the book?
 "THE WITNESS: At that time I probably did, sir. I don't remember specifically.
 "THE COURT: Well, when you looked at the book did it come back to you?
 "THE WITNESS: I can remember a photograph or two in the book, yes, sir.
 "THE COURT: Well, when you looked at the book did it come back to you?
 "THE WITNESS: I can remember a photograph or two in the book, yes, sir.
"THE COURT: At that time did you consider it obscene?
"THE WITNESS: Yes.
"THE COURT: Issue the warrant?
"THE WITNESS: Yes, sir.
"THE COURT: Go ahead.
. . . . .
 "Q. In any event, Mr. Burns, when you looked at that magazine it is a fact, is it or not, that you, in making the determination whether or not to issue this warrant, to find probable cause that this magazine was or was not obscene, you did apply the three criteria set out in the City of Birmingham Ordinance, did you not?
 "A. I assume so. I do not remember what my thoughts were at the time.
. . . . .
 "Q. Then you did take into consideration the three criteria?
"A. I'm sure I did."
According to Burns, no adversary hearing was held when D.S. Luker brought to the Magistrate the affidavit which resulted in the appellant's arrest.
Counsel for the defense, questioning Burns regarding his basis for determining probable cause, was allowed to read into evidence a portion of the transcript from a previous trial involving the appellant, the appellee, and the magazine now under review, "Special Number 20." That transcript reads:
 "Q. What did you use as a guide to determine what those community standards are, and what criteria did you use to determine what the community standards were prior to issuing the arrest warrant for the allegedly obscene publication?
"A. My experience in the community.
. . . . .
 "Q. Did you call anyone that may be an expert or an authority on this?
. . . . .
"A. No, sir.
 "Q. In other words, what you're stating is, is the determination, the final determination, that final determination is yours and not anyone else's of what community standards are?
"A. Yes, sir."
Detective Sgt. L.H. Triplett testified that he was in charge of the Birmingham Vice Division Gambling and Pornography Detail. According to Triplett, plans for arrest or investigations of employees of adult bookstores or for purchases of magazines from adult bookstores were made by him, not by his superiors, although he kept his superiors aware of his activities. The witness admitted that he discussed with his superiors the type of materials which would be purchased to secure arrests for violations of Ordinance 16-18, as amended.
Also, Triplett admitted that they decided to limit their arrests to operators of adult bookstores who sold publications such as *Page 531 
"Special Number 20." Triplett explained this decision by stating:
 "A. At this point in time myself, my captain, my lieutenant, we were all new down there. We had never been exposed to this type of material before. We were just getting guidance on what we can make a case on or what we can't make a case on. We were literally almost told that you can't make a case on other type stuff such as Hustler, Playboy, so we didn't. We decided periodically we would probably check this kind of stuff and look at it. Other than that, we probably wouldn't be able to make a case so why go through the motions and spending everybody's money.
. . . . .
 "THE WITNESS: [W]e were told that we had to look at this thing in the long-run. First of all, we did not believe that if we took the Playboy in front of the jury we would get a conviction. We didn't want to waste our time and the State's time, everybody's time going through the motions of this. We knew we was going to be in front of a jury. You could look at the material itself. You can see the difference between the two publications.
. . . . .
 "THE WITNESS: Playboy has articles, book reviews, record reviews, advertisements. The president of the United States gave an interview in Playboy. This kind of stuff has some kind of value. You take a thing like Special Number 20, it's just got sex from one end to the other. There's not even a place on there where it's manufactured, copyrighted, printed. It's just a title of a book and boys and girls, and boys and boys, and girls and girls. You can just look at the thing and see the difference."
Triplett testified that the decision was made to make arrests whenever publications such as "Special Number 20" could be purchased and that adult bookstores were the only places where such publications could be purchased.
Triplett denied that he and his men were instructed "not to worry about or to consider" publications such as "Hustler," "Playboy," "Oui," and "Penthouse." The witness explained that the decision to occasionally look at such publications was made; however, the decision to "ignore" those publications was not made. Although the witness never made any arrests involving those publications, the publications were purchased by his men. According to Triplett, publications such as "Hustler" are sold throughout the City of Birmingham; however, magazines such as "Special Number 20" are sold only in adult bookstores.
Triplett stated that some books which were purchased from adult bookstores had never been presented to the Magistrate for the purpose of making arrests. When asked whether those books were obscene, the witness stated:
 "I know a couple of times I think we bought some and David didn't think — Officer Luker didn't think they were strong enough to have to get in front of a jury with them. When we buy them we don't really know what we've got until we get back to the office and unwrap them, because they are sealed when we purchase them."
During further questioning, Triplett denied that he had instructed the men in his detail "only to make arrests of adult bookstore operators. . . ." According to the witness, arrests were made "anywhere we can buy a book that we think we can win a case."
David Luker testified that he was employed with the Gambling and Pornography Detail of the Birmingham Police Department Vice Bureau and that his immediate superior was Sgt. Triplett. According to Luker, he had discussed with Triplett the type of publications for which convictions could be obtained and the type of publications for which convictions probably could not be obtained. Luker explained:
 "The idea was tossed around about soft-core pornography and about the possibility of `Hustler.' I understand that it was decided that we would stay with what we *Page 532 
had been doing in the past because we were successful."
Luker acknowledged that he had received, from his superior, instructions to make purchases of magazines at adult bookstores. However, Luker had not received any instructions to purchase magazines such as "Hustler" and "Playboy" from various Birmingham stores nor had he or the men in his detail ever made such a purchase for the purpose of obtaining an arrest warrant. Although, Luker stated, "As for the books, we only make purchases in adult bookstores," he did remember that he had made a case "on fifteen books at a book-selling and trading store in the 2000 block of 5th Avenue North." Luker acknowledged that the store was selling material similar to that which is sold in adult bookstores.
During further questioning, Luker also acknowledged that, after one series of arrests was completed, another series of arrests of the same people was made.
When testifying concerning the affidavit presented by Luker to the magistrate on June 5, 1978, Luker admitted that he could not remember exactly what had transpired on that occasion. The witness did recall that the affidavit was not prepared in the presence of the magistrate and that neither the defendant nor his attorney was present. Luker also recalled that the magistrate did not state that he had probable cause for believing that "Special Number 20" was obscene and that he, Luker, had not described to the magistrate any conversations with the defendant which had occurred at the time the magazine was purchased. Luker could not recall whether the magistrate had read the magazine; however, the witness did remember the magistrate "thumbing through it." Luker admitted that he had not described, in his affidavit, the type of material contained in "Special Number 20." When asked to describe the difference in "Hustler," defendant's Exhibit No. 5, and "Special Number 20," defendant's Exhibit No. 6, Luker explained that "Hustler" shows "simulated sex acts" while "Special Number 20" shows "actual sex acts."
Luker admitted that he had never tried a case involving a publication such as "Hustler," "Penthouse," "Oui," or "Playboy." He also admitted that he had no personal knowledge of whether a jury would render a conviction for such a publication.
Having heard the evidence presented, the trial court overruled both the motion to quash and the motion to suppress.
At the jury trial, Luker gave substantially the same testimony that he had given at the hearing on the motions. Luker testified that, on June 1, 1978, he went to "Pleasure Books East," a public adult bookstore in the City of Birmingham. After entering the store, he picked up a magazine, took it to the counter, and paid the appellant, Jimmy Coble, six dollars and thirty-six cents. Luker identified City's Exhibit No. 1, a magazine called "Special Number 20," as the magazine which he purchased. The witness also identified, in court, the appellant as the man from whom the magazine was purchased. According to Luker, the purchase was made with money supplied to him by the City of Birmingham and was made under instructions from his superior in the vice detail.
After purchasing the magazine, Luker went to his car, removed the cellophane cover from the magazine, and marked it for identification purposes. The magazine was then placed in Luker's evidence locker until the trial date. Luker testified that he had the only key to the locker. The witness stated that while in his office prior to obtaining the arrest warrant, he examined the magazine from beginning to end.
At a later date, Luker presented to the City Magistrate the magazine, "Special Number 20," and an affidavit which contained the appellant's name, the date, time and place of purchase, and the allegation that the sale of the magazine violated City Ordinance 16-18. Subsequently, the appellant was arrested by Luker.
According to Luker, "Special Number 20" showed actual sexual intercourse, cunnilingus, fellatio homosexuality among men, and homosexuality between females. *Page 533 
On cross-examination, Luker acknowledged that the bookstore, "Pleasure Books East" did not cater to customers under nineteen years of age. Luker also acknowledged that magazines such as "Hustler," "Club," "Penthouse," and "Oui" are regularly sold in Birmingham business establishments other than adult bookstores and that those magazines contain stories of explicit sexual activity along with pictures of nude male and female bodies. When questioned as to whether he had received complaints "from mothers or fathers that stated that their juveniles have gone in and seen magazines at a particular establishment here in the City of Birmingham," Luker responded, "I have had complaints, yes, sir."
 I
The first issue raised by the appellant is whether, in obscenity cases, a jury trial is required on the issue of community standards. The appellant argues that "trial by jury after appeal to Circuit Court from bench conviction in Municipal Court does not satisfy Constitutional requirements." Appellant argues that, although such a finding by this court would render Section 16-18 of the General Code of the City of Birmingham, Alabama, 1964, as amended, unenforceable because juries are not permitted in the Municipal Court, the City, nevertheless, prosecutes obscenity matters under § 13-7-181, Code of Alabama 1975. This issue was addressed in Holderfieldv. City of Birmingham, Ala.Cr.App., 380 So.2d 990, and is dispositive of the issue now before this court on appeal.
In Holderfield v. City of Birmingham, supra, this court held that "while the jury system may be the best method for determining obscenity as defined in Miller v. California, [413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419], it is not a constitutional requirement. The statute requiring that all cases in municipal courts shall be tried by a judge without a jury is not unconstitutional as it applies to an obscenity prosecution in the municipal court." See City of Duluth v.Sarette, Minn., 283 N.W.2d 533. Therefore, under the holding ofHolderfield, we find that the appellant, in the present case, was not denied due process of law.
 II
The appellant maintains that Ordinance 16-18, as amended, was systematically and selectively enforced against him as a member of a class operating adult bookstores and that such enforcement resulted in intentional discrimination which is violative of the equal protection clause of the Fourteenth Amendment. This issue was raised in the court below by the pretrial motion to quash.
To show discriminatory enforcement of a municipal ordinance, the appellant must prove the following three elements: (1) Selectivity in enforcement, (2) intentional selectivity, and (3) selectivity based on an unjustifiable standard. Starley v.City of Birmingham, Ala.Cr.App., 377 So.2d 1131. In Starley, this court stated:
 "It is insufficient merely to show that other violators have not been prosecuted, that there has been a laxity in enforcement or that there has been a conscious exercise of some selectivity in enforcement."
Under the facts of this case, we find no evidence to indicate any intentional selectivity based upon an unjustifiable standard. Therefore, because the appellant did not meet his burden of proof, his contention is without merit.
 III
The appellant asserts that the magistrate in this case made a finding of probable cause based on an Affidavit of Complaint which, on its face, contained insufficient evidence to support such a finding and that oral testimony failed to cure the defective affidavit. The Affidavit of Complaint, sworn to by Luker, the arresting officer, omitting the formal parts, states:
 "Personally appeared before me, the undersigned authority in and for said Municipal Court of Birmingham, D.S. Luker who being first duly sworn, says on oath that he has probable cause for believing and does believe that Jimmy Coble, White *Page 534 
Male whose name is otherwise unknown to affiant, did within twelve months before making this affidavit and within the City of Birmingham, or the Police Jurisdiction thereof: Did unlawfully on to-wit: June 1, 1978, at approximately 1:10 P.M. at or near 7606-1st Avenue North, Pleasure Books East, Birmingham, Jefferson County, Alabama, knowingly publish, print, exhibit, distribute, or have in his possession with intent to distribute, exhibit, sell, or offer for sale in the City of Birmingham, Alabama, any obscene matter, to-wit: an obscene book, `Special Number 20,' contrary to and in violation of General City Code 16-18 as amended against the laws and ordinances of the City of Birmingham. . . ."
Although the affidavit recites the affiant's belief, it contains no supporting facts or circumstances upon which a finding of probable cause could have been based; therefore, the affidavit, in and of itself, is insufficient to support a finding of probable cause for an arrest warrant. Aguilar v.Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723; Giordenellov. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503. However, oral testimony is admissible to cure an otherwise defective warrant. Funches v. State, 53 Ala. App. 330,299 So.2d 771; Oliver v. State, 46 Ala. App. 118, 238 So.2d 916.
In the present case, Officer Luker presented the magazine, "Special Number 20," to the magistrate when the sworn affidavit was given. The evidence reveals that the magistrate viewed the magazine before issuing the arrest warrant. In Holderfield, supra, this court held that the presentation of the alleged obscene matter to the magistrate along with the affidavit was sufficient to support a finding of probable cause. Therefore, under the holding of Holderfield, supra, and the facts of the present case we find that the magistrate did not err in finding that probable cause to issue an arrest warrant existed.
 IV
The appellant contends that reversible error was committed when counsel for the City commented on the failure of the defendant to testify. The record reveals the following:
 "MR. MACMAHON: This Defendant, as a matter of law, can produce witnesses. He can take the witness stand. He can cross examine —
 "MR. RITCHEY: Your Honor, Mr. MacMahon knows that's an improper argument. I move for a mistrial.
 "THE COURT: Ladies and gentlemen, that argument is absolutely and totally improper. I am telling you that very, very definitely and it should not be listened to in any means whatsoever. Our Constitution, both State and Federal, and every state in the United States, and every Federal court in the United States says that the defendant never need testify. There is a presumption that he is absolutely and totally innocent until you are convinced beyond a reasonable doubt, and the Defendant need never take the stand. The fact that he does not take the stand in no way whatsoever incriminates him or says anything adverse to him. No comment should ever be made on the fact that he didn't take the stand, and no comment should have been made at that time. It is totally improper. This man is presumed to be innocent until you are convinced beyond a reasonable doubt that he is guilty. The fact that he did not take the stand should not in any wise, in any moment whatsoever be held against him. I want each and every one of you to understand it, and that's why I'm so forceful in what I'm saying.
"Going right down the line, do you understand that?
 "(Whereupon, all twelve jurors answered individually in the affirmative.)
 "And each and every one of you could go and judge this case understanding that completely?
"All right. I overrule the motion.
"MR. RITCHEY: We except."
According to § 12-21-220, Code of Alabama 1975, if the prosecution comments on *Page 535 
the defendant's failure to testify, a new trial must be granted on motion filed within thirty days from entry of the judgment. In Beecher v. State, 294 Ala. 674, 320 So.2d 727, the Alabama Supreme Court held:
 "Where there has been direct comment on defendant's failure to testify, and the trial court has not promptly acted to cure such a statement, the conviction must be reversed." [Emphasis added].
See Lamberth v. State, 54 Ala. App. 233, 307 So.2d 43. The trial court can cure such a prejudicial statement, so that any error is harmless, by appropriate instructions to the jury which include "that such remarks are improper and to disregard them; that statements of counsel are not evidence; that under the law the defendant has the privilege to testify in his own behalf or not; that he cannot be compelled to testify against himself; and that no presumption of guilt or inference of any kind should be drawn from his failure to testify. Whitt v. State, Ala.Cr.App., 370 So.2d 736.
In the present case, although the complained — of remark was a comment on the defendant's failure to testify, the trial court acted immediately to cure the error. We find that the curative instructions given by the trial court were sufficient to meet the "appropriate instructions" requirement of Whitt, supra. Therefore, any error committed by the prosecution's remark was sufficiently cured and rendered harmless.
Finding no error prejudicial to the appellant, we hold that the judgment of conviction by the Jefferson Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.